COHRT, Respondent, v. SUN INSURANCE OFFICE, LTD., Appellant

(49 N. W.2d 589)

(File No. 9256. Opinion filed October 30, 1951)

**Roy E. Willy,** Sioux Falls, for Defendant and Appellant.
**Bielski, Elliott & Lewis,** Sioux Falls, **Danforth & Bleeker,** Mitchell, for Plaintiff and Respondent.

LEEDOM, J. Respondent Priscilla Cohrt, plaintiff below, sued the defendant insurance company to recover for the collapse of the roof and a wall of a warehouse in Mitchell, South Dakota under the windstorm provisions of an insurance policy issued by defendant. Defendant denied that wind was the cause of the damage and injected into the case the question of collapse due to causes excluded by the policy, particularly to deterioration of the building due to age, to poor design of the roof and to the weight of snow. The case was tried to the court without a jury on stipulation and resulted in a judgment for plaintiff. Defendant contends in its appeal (1) that the court's findings of fact do not support the conclusion of liability; and (2) that the evidence does not support the findings. No other questions are presented here. We are of the view that the judgment entered by the trial court is proper under the law and the facts.

The warehouse is one story. The roof was essentially flat, actually sloping down about 2 inches from both the north and south walls to the center, with the whole sloping slightly to the west for drainage. The roof was 38½ feet wide east and west, 42 feet across the north-south dimension at the front and about 34 feet at the rear. It was wholly

unsupported from the ground except by the four walls. Except for the walls the only support to this broad expanse of roof was a trussed fabricated beam running east and west the full width of the building at about the center of the north-south dimension. The beam, about 10" x 10", was made up of a series of 2" x 10" planks spiked together 5 such planks thick and was long enough to cover the 38½ feet between the east and west walls plus the additional length required to permit 8 inches of the beam to rest on the 8 inch east and west masonry walls. Under the full length of this beam and anchored at each of its ends was a steel truss rod 1⅛ inch in diameter. Between the beam and the truss rod were two 10" upright timbers spaced to divide the width of the roof approximately in thirds furnishing bearing points for the beam from the rod.

Fitted flat against each end of the beam was a steel plate ⅜" thick and 6" wide extending the full height of the beam ends and bent to extend under each end about 3 inches. The truss rod extended from its position about 10 inches below the beam at the center portion of the building on an angle to converge with the beam at is extermities. The ends of the rod ran in grooves cut at angles along the center of the ends of the beam, and through holes in the end plates where the threaded rod was secured on both ends by suitable nuts. Each end of the beam, thus trussed, rested in a niche the full thickness of the 8 inch walls. The end resting on the east wall was covered over with a 4 inch brick veneer. The east wall extended above the roof line about 2 feet to form an appropriate front for the building. Along the top ran a decorative coping.

On each side and flush with the bottom of the beam, strips of 2 x 4 were nailed to support ceiling joists extending from the north and south walls to the beam. These joists were notched to fit the 2 x 4 strips and toenailed to the beam and the strips. Vertical strips extended upright from these ceiling joists to roof joists only a sufficient distance apparently to provide dead air space between the ceiling and the roof and to allow for the drainage conformation of the roof. The roof supports from the ceiling were braced by diagonal members running alternately from the bottom

to the top and thence the top to the bottom of the uprights. The roofing was built up of tar and paper. The building was about 30 years old.

On November 18, 1948 the City of Mitchell and surrounding area was struck by a typical blizzard. The circuit court found that the wind reached a velocity of 45 miles per hour and sometimes exceeded this velocity. The wind blew from the northwest and occasionally the west. During the 18th and 19th, a part of which period followed the collapse of the roof, 12 inches of snow fell. The moisture content especially during the earlier part of the snowfall was such that by Weather Bureau standards the snow could be termed "heavy".

There is no direct evidence as to the amount of snow, if any, that accumulated on the roof prior to the collapse. No one saw or knows when the roof and wall fell insofar as the record discloses. There is no evidence of other wind damage in the Mitchell vicinity. A partially built dwelling across the street from the warehouse, seemingly vulnerable to wind damage due to its state of incompletion, withstood the storm.

When the damage was discovered the material comprising the east wall of the warehouse was lying on the abutting sidewalk and street,—the wall had fallen to the east. The coping from the top of the wall was about 30 feet from the wall foundation. None of the material of the wall fell inside the building. A large truck door in the east wall had fallen flat onto the sidewalk and was not materially damaged. Only one of its 24 panes of glass was broken. This door had been installed in the wall about 4 feet north of the point where the east end of the center beam rested on the east wall. The roof had no structural connection with the east wall except where the beam rested.

The roof proper, except that it had fallen out of place, was not damaged,—that is no parts were detached and strewn around or blown away. The center beam did not break along its length at any point. Neither did the truss rod. The east end of each was dangling near ground level with the end plate attached to the rod. The west ends remained substantially in their original positions. The tim-

bers of the east end of the beam were separated, with possibly some splitting of one or more, for an undetermined distance back from the east extremity. The uprights between the beam and truss rod were of out position.

A window in the south wall of the building was broken and so was another in a building immediately west of the warehouse, actually an adjunct to it, separated by a partition with an opening at the top and open doorways. The evidence contains statements indicating that wind came in these broken windows causing the damage.

One witness testified: "The stronger the wind, the stronger the gust condition, because those gusts are created by ground suction." This testimony relates more specifically than any other evidence to the court's determination that the roof was lifted not by wind pressure from underneath but by a vacuum above.

A three story building was west across the alley from the warehouse. The entire block in which the warehouse was situated was solidly built with buildings north of the warehouse.

Details of construction and of the condition of the building and exact location of dislocated material immediately after the collapse have been given inasmuch as such details in the particulars hereafter noted constitute in our opinion the principal support to be found in the record for the court's decision.

By finding of fact XI the court found "* * * that the collapse and damage of said building was caused by a risk included within the insurance provisions of said policy, and was not caused by an excluded risk * * *". No other finding of fact relates to the cause of the collapse. In its conclusion of law II the court states: "That the collapse of said building was not caused by the pressure of wind entering the building through any aperture therein or by any wind force within the building directed upward against the ceiling or outward against the east wall of the building; that such collapse was occasioned by a vacuum formed and caused by the wind immediately over and above the roof, which vacuum and resulting upward thrust raised said roof sufficiently to so minimize the weight of such roof as to cause

the truss-supported beam to spring vertically upward sufficiently to enable the two vertical timbers or legs between the under side of the beam and the supporting truss rod to become separted from such rod, so that on the return of the roof to its normal position, it sprung down and directed a horizontal, battering-ram pressure against the wall sufficient to cause the wall to topple as a unit to the east and precipitate the coping on top of the wall to a distance of approximately 30 feet from the foundation wall; that either the sole cause, or at least the dominant and proximate cause of the collapse and damage to plaintiff's building, as found herein, was the said windstorm, and velocity of the wind in said windstorm, and that said collapse and damage were the result of a risk insured against by said defendant, and was not within an excluded risk, specified in said policy."

Appellant argues that finding of fact XI is not a finding of fact but a conclusion of law, and since there is no other finding in the "Findings of Fact" as to the cause of the collapse the conclusion of law as to liability under the policy is wholly unsupported. In many instances it is difficult to distinguish ultimate facts from conclusions of law. In view of the circuit court's conclusion of law number II we need not decide whether finding XI can properly be regarded as a finding of an ultimate fact.

Conclusion of law II, above, is essentially a finding of fact and we so regard it notwithstanding its denomination as a conclusion of law. This court has followed such rule over a long span of years. In re Guardianship Moulton (Hines v. Moulton), 63 S. D. 535, 261 N. W. 666, 667; State ex rel. Parsons c. Kaufman, 50 S. D. 645, 211 N.W. 691, 693; Dodson v. Crocker, 20 S. D. 312, 105 N.W. 929.

Conclusion of law II is not only a finding but a finding with refinements. Whereas a finding simply that the collapse of the warehouse was caused by wind might have sufficed and given the reviewing court a broader field from which to glean supporting evidence, the trial court went further and found the exact manner in which the wind brought down the building.

We are bound by a well established rule to give great weight to the trial court's findings and they are not

to be disturbed unless we can say that the evidence clearly preponderates against them. See Breneman et al. v. Aune, 73 S.D. 478, 44 N.W.2d 219, 221 and earlier cases there cited. Notwithstanding several circumstances established by the evidence,—as for instance the amount of snow that fell, the age of the building and the absence of pillars and ground support both indicating susceptibility to collapse from comparatively little additional weight on the roof, the lack of other wind damage in the vicinity of Mitchell and the protection the warehouse had from other structures on the windward sides,—we cannot say from the whole record that the evidence clearly preponderates against wind as the destructive cause. We believe many reasonable men might affirm the following conclusions: (1) Neither the beam nor the truss rod broke nor did any of the roof or ceiling rafters as would quite necessarily have been the result of crushing weight affecting a weakened, central part of the roof, and the impression is obtained from the whole record that the central part was weakest. (2) If however the east wall was the weakest spot in the roof support as claimed in certain testimony, and weight wherever applied on the roof was transmitted to such weak spot, a collapse of the east wall under the beam due to pressure from above would quite certainly result in a pile of rubble inside and outside the building near the beam; and the fall of the center beam crushing straight down would likely have damaged the truck door which under these circumstances would not have been forced east and out of the line of destruction. (3) The prospect of down pressure shortening the center beam sufficiently to remove it from its niche in the east wall without breaking itself or breaking the truss, and then by springing back to normal length and thus serving as a battering ram to drive the east wall out, strains the credulity of reasonable men. (4) The springing of the beam to give the effect described in (3) above by pulling the end plate through the assembled ends of the 2 x 10 planks would necessarily have crushed and splintered the ends and such was not the case.

The foregoing possibilities fairly exhaust the reasonable means by which downward pressure of extra weight on the roof could effect the exact results shown by the physical

facts. Thus we cannot say the evidence clearly preponderates against damage by wind; and so approach the question as to whether it supports the trial court's finding that the wind by vacuum above lifted the roof.

Having already decided that damage due to wind is proper under the record we cannot logically reject the trial court's finding of lift by a vacuum without substituting another means the wind employed that has better support in the evidence. The only other method suggested in the whole record is that wind entered the warehouse through the broken pane of one window and a second broken sash in the adjoining building. We find nothing in the record recommending over the court's findings a finding of wind pressure under the roof from the broken windows. The testimony of ground suction in such a storm as the one here involved, given by a licensed instructor in meteorology is significant. A comparatively slight lift of the roof not only could but would in all probability dislocate the short uprights between the center beam and truss rod; it could also spring upward and thus shorten the long beam because it was not braced or trussed except for down pressure. Shortening of the beam and loss of the support of the truss could dislodge the east end of the beam from its niche and permit it to thrust the east wall out as the weight of the roof settled on it. These considerations, based on the evidence, tend to support the finding of the lifting of the roof by a vacuum. We conclude that the evidence does not clearly preponderate against this finding of the trial court.

The judgment of the circuit court is affirmed.

All the Judges concur.