# KARL A. DANIELSON AND ANOTHER v. ST. PAUL FIRE & MARINE INSURANCE COMPANY.

98 N. W. (2d) 72.

July 24, 1959—No. 37,643.

*Meagher, Geer, Markham & Anderson, Mary Jeanne Coyne,* and *O. C. Adamson II,* for appellant.

*Gleason, Ward, Orff & Johnson,* for respondents.

DELL, CHIEF JUSTICE.

In this case a barn, owned by plaintiffs and insured by defendant, collapsed. This action was instituted to recover on an insurance policy which insured against loss from fire and, because of extended coverage, windstorm. The jury returned a verdict for plaintiffs, and defendant appealed from the denial of its alternative motion for judgment notwithstanding the verdict or for a new trial.

Plaintiff Karl A. Danielson was an employee of Thorpe Brothers, a real estate company in Minneapolis. Mr. Danielson and his wife, the other plaintiff herein, purchased a farm in Blue Earth County in 1946. They did not live on the farm but engaged a farm-management company and a tenant farmer to operate it. The former was responsible, among other things, for the maintenance and repair of the farm buildings. One of those buildings was the barn which, prior to the time that defendant insured it, had been insured with the Niagara Insurance Company for $6,000. It was Thorpe Brothers' policy to secure the insurance on property which its employees owned, if possible. It solicited this insurance from plaintiffs on behalf of defendant. This was the only company for which Thorpe Brothers were agents handling fire and extended coverage insurance on farms.

Before issuing the policy, a binder was placed on the property until it could be inspected. A binder is a type of temporary coverage which is used in some instances until the policy itself is written. The amount of insurance on the barn was reduced to $5,000 and it, along with the other farm buildings, was inspected by defendant's state agent, who made the following report:

"I inspected this farm, and the general condition of the buildings is fair to good and the amounts of insurance are pretty well in line. * * *

The barn, while probably justifying the $5000 insurance, is older and should have some repair to sills. Part of the roof has apparently been hit by wind and has been patched here and there."

On the basis of the agent's report and plaintiffs' application, defendant approved the risk and issued a 3-year policy on October 15, 1954, which included the following provisions:

"The Policy shall be void if * * * without the assent of the Company, * * * the situation or circumstances affecting the risk shall, by or with the knowledge, advice, agency, or consent of Insured, be so altered as to cause an increase of such risks * * *.

"If the insured property shall be exposed to loss or damage by fire, the Insured shall make all reasonable exertions to save and protect same.

*   *   *   *   *

"* * * [W]herever the word 'fire' occurs, it shall be held to mean 'windstorm, cyclone and/or tornado.' "

It is undisputed that the barn in some respects was seriously deteriorated. Some of the sills and uprights were rotted, and there was some "waving" in the roof. The building was 18 inches to 2 feet out of plumb. Just a few days before it collapsed the door was seriously out of line and could not be closed. However, the tenant farmer continued to use it for milking and storage. Repeated attempts were made to have plaintiffs repair the barn. Mr. Danielson continually promised to undertake the repairs but always failed to do so. Nevertheless defendant continued the policy in full force and made no effort to cancel it until after the barn collapsed.

October 1956 was an unusually windy month and noticeable changes occurred in the barn. Just a few days before it collapsed there were strong winds with very strong gusts. On Thursday, the 11th, the wind reached 24 miles an hour with gusts up to 35 miles an hour. The next day, although it was not quite as windy, it was necessary to adjust the pipes from the milking machine inside the barn to the line into the milk house. On Saturday, October 13, there were winds up to 25 miles an hour with gusts of 38, and occasionally 46, miles an hour. The next day it was again necessary to reset the pipes from the milking machine.

The building, however, did not fall then but collapsed on Wednesday, October 17, a day which was comparatively calm.

Plaintiffs claim that the collapse was the result of the preceding windstorms which left the barn in such a condition that the fall, although delayed, was inevitable. Defendant claims the collapse was due solely to the deterioration of the structure. The evidence is not conclusive either way. There was testimony concerning the extreme disrepair of the barn. There was also testimony that barns in similar states of disrepair in the area had not collapsed of their own weight. And there was testimony by a competent witness, who had done some appraising, that no barns with rotting sills on which he had written insurance (that is, barns that were insurable risks) had ever collapsed after only 2 years.

■ At the close of all the evidence defendant moved for a directed verdict on the ground that plaintiffs had failed to show that the barn collapsed as a result of windstorm. The motion was denied and one of defendant's assignments of error on appeal, although it is not strenuously advanced, is the trial court's failure to grant the motion and its subsequent denial of defendant's motion for judgment notwithstanding the verdict. Upon a motion for a directed verdict, the court must view the evidence in the light most favorable to the nonmoving party, admitting its credibility and all reasonable inferences to be drawn therefrom. Only when the court would be required to set aside a contrary verdict as being manifestly against the weight of the evidence, or where the verdict would be contrary to law, should the motion be granted.[1]

We are of the opinion that when the facts are viewed in the light most favorable to plaintiffs the jury could have found that the collapse of the barn resulted from the windstorms a few days earlier; that there had been no substantial increase in the risk which defendant insured; that plaintiffs' delay in making repairs was not unreasonable and in any event was known to the defendant which kept the barn insured; that the policy was, therefore, in full force; and that plaintiffs were

---

[1]Erickson v. Strickler, 252 Minn. 351, 90 N. W. (2d) 232; Caron v. Farmers Ins. Exch. 252 Minn. 247, 90 N. W. (2d) 86; Hanson v. Homeland Ins. Co. 232 Minn. 403, 45 N. W. (2d) 637.

entitled to recover. Mere lapse of time does not destroy a causal relationship.[2] A new and sturdy barn which had withstood the winds' buffeting over an extended period and then fallen on a calm day shortly thereafter would not be exempted from coverage, and the jury could find that prior to the windstorm in question plaintiffs' barn would not have fallen of its own weight and that the storm was the cause of the collapse.[3]

An extensive discussion of the many pertinent opinions will serve no useful purpose. However a few are worthy of mention. In both Bogalusa Gin & Warehouse, Inc. v. Western Assur. Co. 199 La. 715, 6 So. (2d) 740, and Pearson v. Aroostook County Patrons Mutual Fire Ins. Co. 149 Me. 313, 101 A. (2d) 183, the insurers claimed that although the buildings involved fell during windstorms, the real cause of their collapse was decay. In the former case the building (199 La. 718, 6 So. [2d] 741) "was some twenty-five years old and decay had

---

[2]Honer v. Nicholson, 198 Minn. 55, 59, 268 N. W. 852, 854; Sporna v. Kalina, 184 Minn. 89, 91, 237 N. W. 841, 842, 76 A. L. R. 1280; Peerless Hosiery Co. v. Northern Ins. Co. (D. Conn.) 108 F. Supp. 52, 54, affirmed (2 Cir.) 199 F. (2d) 957. And see, 13 Dunnell, Dig. (3 ed.) § 7000(2), and note 53 thereto.

[3]Druggist Mutual Ins. Co. v. Baker (Ky.) 254 S. W. (2d) 691; Bogalusa Gin & Warehouse, Inc. v. Western Assur. Co. 199 La. 715, 6 So. (2d) 740; Hayward v. Carolina Ins. Co. (La. App.) 51 So. (2d) 405; Pearson v. Aroostook County Patrons Mutual Fire Ins. Co. 149 Me. 313, 101 A. (2d) 183; Brown v. Pennsylvania Fire Ins. Co. (Mo. App.) 263 S. W. (2d) 893; Metropolitan Ice Cream Co. v. Union Mutual Fire Ins. Co. (Mo. App.) 210 S. W. (2d) 700; Schaeffer v. Northern Assur. Co. (Mo. App.) 177 S. W. (2d) 688; Id. (Mo. App.) 179 S. W. (2d) 923; Higginson v. Fireman's Fund Ins. Co. 186 Pa. Super. 650, 142 A. (2d) 737; Adams Apple Products Corp. v. National Union Fire Ins. Co. 170 Pa. Super. 269, 85 A. (2d) 702; Cohrt v. Sun Ins. Office, 74 S. D. 153, 49 N. W. (2d) 589. But see, Hartford Fire Ins. Co. v. Wolf Bldg. Co. (7 Cir.) 92 F. (2d) 776. Cf. Lipshultz v. General Ins. Co. 256 Minn. 7, 96 N. W. (2d) 880; Anderson v. Connecticut Fire Ins. Co. 231 Minn. 469, 43 N. W. (2d) 807; Queen Ins. Co. v. Larson (9 Cir.) 225 F. (2d) 46; North British & Merc. Ins. Co. v. Sciandra, 256 Ala. 409, 54 So. (2d) 764, 27 A. L. R. (2d) 1047; Trexler Lbr. Co. v. Allemannia Fire Ins. Co. 289 Pa. 13, 136 A. 856; Providence Washington Ins. Co. v. Cooper (Tex. Civ. App.) 223 S. W. (2d) 329.

set in in many parts of it. It was not in the best of condition at the time it was blown down." In the Pearson case defendant argued that the day on which the collapse occurred (149 Me. 317, 101 A. [2d] 185) "was 'nothing more than an ordinary March day in Maine, not a windstorm * * *' " and that (149 Me. 316, 101 A. [2d] 185) "the building could readily have collapsed from the force of a very light wind," especially when "[t]here was no evidence of destruction of other property in the vicinity at the time the hen house collapsed." Both courts held that the issues involved were fact questions notwithstanding the evidence of deterioration.

A stronger case is Schaeffer v. Northern Assur. Co. (Mo. App.) 177 S. W. (2d) 688. Two very windy days were followed by a day which, although windy, was calmer than the preceding days. On the evening of the third day the roof of plaintiff's building was damaged. The court held that whether (177 S. W. [2d] 691) "the roof slid down of its own weight and not as the result of a windstorm" was for the jury despite "testimony on the part of defendant that the roof was defectively constructed in that there were insufficient knee braces and collar beams and no bolts fastening the wall plates to the walls."

Perhaps the strongest case is Cohrt v. Sun Ins. Office, 74 S. D. 153, 49 N. W. (2d) 589. Defendant argued that the collapse was due to (74 S. D. 154, 49 N. W. [2d] 589) "causes excluded by the policy, particularly to deterioration of the building due to age, to poor design of the roof and to the weight of snow." The court held that the evidence would sustain a finding that the damage was caused by wind even though (74 S. D. 156, 49 N. W. [2d] 590):

"* * * No one saw or knows when the roof and wall fell insofar as the record discloses. There is no evidence of other wind damage in the Mitchell vicinity. A partially built dwelling across the street from the warehouse, seemingly vulnerable to wind damage due to its state of incompletion, withstood the storm."

We conclude that the cause of the collapse was a question for the jury. We reach the same conclusion in respect to the issue of whether the risk was increased. In doing so we cannot overlook the fact that defendant did not insure a new or sturdy barn. The building was in

disrepair at the time the policy was issued and defendant knew it from the investigator's report. Defendant's repeated requests that plaintiffs repair the barn also show that it was aware of the barn's condition. Yet neither the risk itself nor the amount of insurance was questioned when the policy was issued, and the insurance was continued in full force when, at any time, defendant could have cancelled the policy either entirely or subject to reinstatement upon completion of the repairs. It was only after the barn collapsed that defendant attempted to cancel it. Under these circumstances defendant must be presumed to have known what it was doing when it wrote the policy and continued it in force,[4] especially since it had solicited plaintiffs' business away from another insurer which had previously issued a policy in an amount that was $1,000 more than that written by defendant.[5] In a barn of that age a certain amount of structural change is to be expected. That in itself does not necessarily increase the risk as a matter of law and in view of the testimony that such serious deterioration does not usually occur during a 2-year period, we think the question was for the jury.

In our opinion it was for the jury to decide whether plaintiffs complied with the policy provision requiring them to protect the property once it was exposed to loss or damage from fire or windstorm. The provision in question is written to cover the risk of fire and covers windstorm only by virtue of a later clause. Exposure to loss or damage by fire implies an imminent danger to the structure either from an existing fire which threatens it or from allowing it to become unsafe. The risks from fire and windstorm are not identical, and the terms of the provision must be construed according to the nature of the risk to which the barn was exposed.[6] In Pearson v. Aroostook County Patrons

---

[4]See, Bolduc v. New York Fire Ins. Co. 244 Minn. 192, 69 N. W. (2d) 660.

[5]Cf. Blazek v. North American Life & Cas. Co. 251 Minn. 130, 139, 87 N. W. (2d) 36, 43; Olsson v. Midland Ins. Co. 138 Minn. 424, 429, 165 N. W. 474, 476.

[6]Brighton v. North River Ins. Co. 106 N. J. L. 10, 147 A. 481; Hartford Fire Ins. Co. v. Dorroh, 63 Tex. Civ. App. 560, 133 S. W. 465. And see, Motor Vehicle Cas. Co. v. Smith, 247 Minn. 151, 76 N. W. (2d) 486; Bol-

Mutual Fire Ins. Co. 149 Me. 313, 320, 101 A. (2d) 183, 186, the Supreme Judicial Court of Maine stated:

"* * * [W]indstorm insurance differs from fire insurance. There may never be exposure to fire during the term of the policy; there will necessarily * * * be exposure to windstorm.

"A second consideration we may fairly take into account is this: most buildings in Maine are not damaged by windstorm, and all windstorms do not cause damage. Surely the company would not have covered this hen house * * * if hen houses of this type and size and in good repair would not withstand ordinary winds and indeed most windstorms."

We do not believe that plaintiffs were required to decrease the risk during the term of the policy by keeping the barn in a condition which was superior to that at the time of its issuance. Nor were they required to take greater precautions than were necessary at the time the risk was originally accepted. The best evidence which either side could produce is that plaintiffs first became acutely aware of the deterioration 4 days before the barn collapsed. Under all the circumstances we believe it was a jury question whether, by not immediately undertaking the repairs, plaintiffs did not make reasonable exertions to save the property.

Since the case was properly before the jury its verdict resolved the fact issues in plaintiffs' favor.[7] Defendant's motion for judgment notwithstanding the verdict could be granted only if the evidence is manifestly contrary to it.[8] We have already indicated that this is not such a case. The motion, therefore, was properly denied. The remaining issue then is whether there were any other errors which require us to grant a new trial. After the trial court had instructed the jury and it had retired, it returned for additional instructions. Defendant claims that they should not have been given without notifying defense counsel who was then in his office two blocks from the court. This objection

duc v. New York Fire Ins. Co. 244 Minn. 192, 69 N. W. (2d) 660; Cement, Sand & Gravel Co. v. Agricultural Ins. Co. 225 Minn. 211, 30 N. W. (2d) 341.

[7]L'Evesque v. Rognrud, 254 Minn. 55, 93 N. W. (2d) 672.

[8]Swanson v. Minneapolis St. Ry. Co. 252 Minn. 484, 90 N. W. (2d) 514.

is without merit. No prejudicial error results from failing to notify counsel to be present when giving additional instructions requested by the jury. It is not a matter of right in civil cases although it may be desirable and a courtesy which should be extended freely.[9]

Defendant also claims that the additional instructions were inconsistent with and contradicted the original charge. When the jury returned, it asked three questions of the trial court. The first dealt with the investigator's report. The jury wanted to know whether it was "to be considered a part of the policy, * * * [a]nd, being it is the plaintiffs' exhibit, can it be used * * * by or as evidence against either the defendant or the plaintiff?" The court informed them that the report was not, "strictly speaking, a part of the policy, but * * * part of the basis upon which * * * [the company] issued the policy." It also said that the report could be used for either party because it affected the whole case. The court did not cover the report specifically in the original charge. Thus this subsequent question and answer could not contradict or be inconsistent with the original charge. We are also of the opinion that the answer of the court was correct. The only construction we can place upon the question of the jury is that it wanted to know whether the report could be used not only for the plaintiffs who introduced it, but also against the defendant. We agree with the trial court that since the report went to the heart of the matter it could be used for or against either party. It should also be noted that if, as defendant contends, "the question was prompted by a desire to consider the exhibit * * * as evidence against the plaintiffs," then the court's affirmative answer favored defendant's position and, therefore, defendant is in no position to complain.[10]

The other instructions of which defendant complains were given immediately after the one just noted in the following dialogue:

"First Woman Juror: * * * [I]s it a law that an insured is required to keep his property repaired? *Is there any kind of a state law to that effect?*

[9]Zuber v. N. P. Ry. Co. 246 Minn. 157, 74 N. W. (2d) 641; 19 Dunnell, Dig. (3 ed.) § 9790.

[10]Cf. Stark v. Magnuson, 212 Minn. 167, 2 N. W. (2d) 814; 14 Dunnell, Dig. (3 ed.) § 7173.

"The Court: No.

\* \* \* \* \*

"First Woman Juror: And the other question we have is, if we feel that both parties are negligent, are we required to return a verdict in favor of the defendant?

"The Court: Well, negligence has nothing to do with this case. This is a matter of a contract. Remember I told you that an insurance policy is a contract?

\* \* \* \* \*

"\* \* \* And the rights and responsibilities of the parties are governed by the contract." (Italics supplied.)

In its memorandum denying defendant's motion, the trial court expressed its opinion that the juror's question referred to any state statute which required plaintiffs to keep their property in repair. If that is true then, of course, the court's answer was correct. Defendant, however, contends that by "state law" the juror meant any rule of law in addition to what might be found in the statutes. We have previously held that where an instruction is susceptible of two meanings, one which is correct and the other incorrect, we will presume the former to be the sense in which the instruction was given.[11] Applying that principle to the instant case we conclude that although this is a borderline situation, the trial court was in a better position to assess the meaning which the juror intended by the words "state law" and that it was not in error in giving the answer it did. Furthermore, when the instruction is read in conjunction with the next statement, that this policy was a contract and that the rights and responsibilities of the parties were governed by it, any inaccuracy in the preceding statement should have been clarified. Viewing the instructions as a whole, we find no inconsistencies between the original charge and the additional instructions which require us to grant a new trial.[12]

---

[11]Donea v. Massachusetts Mutual Life Ins. Co. 220 Minn. 204, 19 N. W. (2d) 377; Erd v. City of St. Paul, 22 Minn. 443; Siebert v. Leonard, 21 Minn. 442.

[12]See, Leman v. Standard Oil Co. 246 Minn. 271, 74 N. W. (2d) 513; Gillson v. Osborne, 220 Minn. 122, 19 N. W. (2d) 1.

Affirmed.

MR. JUSTICE MATSON took no part in the consideration or decision of this case.